STEPHEN J. BRUNO *v.* LISA BRUNO
(AC 34033)

Beach, Bear and Mihalakos, Js.

Argued May 21—officially released October 1, 2013

*Lisa Bruno*, self-represented, the appellant (defendant).

*Charles D. Ray*, with whom was *Lee Friend Lizotte*, for the appellee (named plaintiff et al.).

BEACH, J. The central issue presented in this appeal is whether the trial court erred by permitting the plaintiff, Stephen J. Bruno, and his current wife, Christina Bruno, to obtain discovery upon their filing of motions to open certain postjudgment orders on the basis of alleged fraudulent conduct on the part of the defendant, Lisa Bruno, without first substantiating their allegations of her fraud beyond mere suspicion in a court hearing. We hold that the court did not have the authority to allow discovery in this context and remand the case for proceedings consistent with the procedure delineated in *Oneglia* v. *Oneglia*, 14 Conn. App. 267, 540 A.2d 713 (1988).

According to Stephen Bruno's attorneys, "[t]his should have been a simple, straightforward dissolution of marriage case," the reality has been anything but simple. On March 17, 2008, the trial court, *Hon. Sidney Axelrod*, judge trial referee, dissolved the marriage of Stephen Bruno and Lisa Bruno and entered financial orders. More than five years later, the distribution of marital property included in the dissolution judgment still has not occurred; its fulfillment has been stalled by allegations of theft, destruction of marital property by arson and other more pedestrian acts of dishonesty.

Several of the financial orders are of particular relevance to this appeal. Real property located at 111 Spring

Valley Road in Ridgefield was to be sold and the net proceeds of the sale were to be divided equally between the parties. Until the property was sold, Stephen Bruno was to be responsible for the mortgage payments and other "shelter expenses" associated with that property. Real property located at 38 Pumping Station Road in Ridgefield was also to be sold and the net proceeds of the sale were to be divided equally between the parties. Lisa Bruno was to be responsible for the mortgage payments and other expenses related to that property until a sale could be completed. Lisa Bruno was awarded $300,000 from a Charles Schwab account (Schwab account) that, as of August 31, 2007, had a balance of $2,451,343.62. After a $22,826 debt was paid from this account, the remaining balance was to be divided equally between the parties.

Lisa Bruno filed several appeals, which stayed the equitable division of the marital assets.[1] See *Bruno* v. *Bruno*, 132 Conn. App. 339, 341, 31 A.3d 860 (2011) (providing chronology of factual and procedural history relevant to this case). In August, 2009, Lisa Bruno withdrew those appeals, thereby lifting the appellate stay and theoretically enabling the property distribution to go forward. Id., 341–42. Shortly thereafter, both parties filed a number of motions. Each side claimed the other was not in compliance with the financial orders. On

[1] The effect of the appeals was that the financial orders with respect to the mortgages and shelter expenses of the two marital homes were stayed. The court, *Winslow*, *J.*, later ruled that in the absence of operative court orders assigning financial responsibility for the maintenance of these two properties to either Stephen Bruno or Lisa Bruno, the pendente lite orders, which had provided that these shelter costs would be paid from the Schwab account, remained in effect. *Bruno* v. *Bruno*, 132 Conn. App. 339, 355–56, 31 A.3d 860 (2011). Lisa Bruno appealed from this ruling, claiming that the pendente lite orders had terminated at the time the dissolution judgment was entered. Id., 355. This court agreed with her position; see id., 356–57; but the combination of the stay of the financial orders and the termination of the pendente lite orders left unresolved the financial responsibility for two significant marital assets.

December 21, 2009, the parties appeared at short calendar before the court, *Winslow, J.* The court heard argument only on a motion for contempt filed by Lisa Bruno.[2] See id., 352. The purpose of her motion was to force the distribution of assets from the Schwab account. Id. Lisa Bruno told the court that, "I cannot pay my mortgage [on the 38 Pumping Station Road property] if I do not get my property distribution, which means that the house is in foreclosure." The court did not hold Stephen Bruno in contempt but ordered him to comply immediately with the financial orders concerning the Schwab account. *Bruno* v. *Bruno,* supra, 352. Stephen Bruno appealed from that order,[3] arguably staying the effectuation of the financial orders pursuant to Practice Book § 61-11 (a).[4] Lisa Bruno thereafter filed a motion to terminate any stay associated with Stephen Bruno's appeal.[5] Id., 353. On March 8, 2010, the court heard argument on the motion to terminate the stay, and issued an order. Id. The court found that no stay was

[2] Although Judge Axelrod presided over the dissolution proceeding and much of the subsequent litigation over the effectuation of the financial orders, Judge Winslow presided over some of the postjudgment proceedings. The gist of what Stephen Bruno sought to argue at the December 21, 2009 hearing was that the financial orders had been undermined by certain actions taken by Lisa Bruno. He specifically contended that any money that he owed Lisa Bruno under the dissolution judgment was offset by the loss of his equity in 38 Pumping Station Road, which he alleged was caused by Lisa Bruno's failure to make mortgage payments and to maintain homeowner's insurance, as well as her alleged role in committing arson on the property.

[3] This court dismissed this appeal by an order dated May 19, 2010.

[4] Practice Book § 61-11 (a) provides in relevant part: "Except where otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order shall be automatically stayed until the time to take an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause. . . ."

[5] Practice Book § 61-11 (d) provides in relevant part: "[T]ermination of a stay may be sought in accordance with subsection (e) of this rule. If the judge who tried the case is of the opinion that (1) an extension to appeal is sought, or the appeal is taken, only for delay or (2) the due administration of justice so requires, the judge may at any time after a hearing, upon motion or sua sponte, order that the stay be terminated. . . ."

in effect as to the property orders, but even assuming one was, the court terminated it. Id. The court also held that the division of the assets in the Schwab account should be based on their value as of August 31, 2009. Id. Lisa Bruno took an appeal from that aspect of the order. Id., 341–42.[6]

What transpired next is at issue in the present appeal. On June 7, 2010, the court found Stephen Bruno in contempt for his failure to distribute to Lisa Bruno the $300,000 from the Schwab account as previously ordered. Additionally, the court ordered that the entirety of the Schwab account be transferred to Lisa Bruno by June 18, 2010, pending further calculations by the court regarding how the balance of the account should be distributed between the parties.[7] If Stephen Bruno did not transfer the funds as ordered, the court further stated that he should report to court on June 28, 2010, at which time he would be incarcerated. Stephen Bruno did not transfer the assets in the Schwab account to Lisa Bruno; nor did he report to court on June 28, 2010. Consequently, the court issued a capias and set bond in the amount of $900,000, and later increased it to $1,600,000.[8] Stephen Bruno has not appeared in person in court since.

[6] The court applied this date because it was the date on which Lisa Bruno withdrew her appeals from Judge Axelrod's judgment of dissolution and attendant financial orders. *Bruno* v. *Bruno*, supra, 132 Conn. App. 353 and n6. This court reversed that aspect of Judge Winslow's order, holding that "[the] date of the granting of the divorce is the proper time by which to determine the value of the estate of the parties [and] upon which to base the division of property." (Internal quotation marks omitted.) Id., 354.

[7] On July 2, 2010, Judge Winslow held a hearing and determined that, based on the value of the Schwab account as of August 31, 2009, Stephen Bruno owed Lisa Bruno $1,404,337.26 and $88,941.36 in interest. *Bruno* v. *Bruno*, supra, 132 Conn. App. 353–54. As noted in footnote 6 of this opinion, the basis for that calculation was overturned by this court. Id., 354–55.

[8] "[General Statutes §] 52-143 authorizes the trial court to issue a capias to compel the appearance of a witness who fails to appear without justification." (Internal quotation marks omitted.) *Housing Authority* v. *DeRoche*, 112 Conn. App. 355, 372, 962 A.2d 904 (2009). Stephen Bruno argues that the court was without authority to issue the capias because at the time that

In his absence, Lisa Bruno has filed numerous motions for contempt seeking enforcement of the financial orders, which motions were granted by Judge Winslow and Judge Axelrod. In a memorandum of decision dated March 31, 2011, Judge Axelrod summarized Stephen Bruno's persistent defiance of court orders and concluded: "This court has never found a party to be more in contempt of court orders than [Stephen Bruno] has been."

In March, 2011, the court granted Lisa Bruno's motion to cite in Christina Bruno, Stephen Bruno's current wife, and Jean Bruno, his mother, as parties, based on Lisa Bruno's allegations that they were conspiring with Stephen Bruno to hide assets to which she was entitled under the dissolution judgment.[9] Thereafter, Stephen Bruno and Christina Bruno filed a series of postjudgment motions to open the court's findings of contempt against Stephen Bruno on the basis that they were obtained through Lisa Bruno's fraudulent conduct. In connection with their motions, Stephen Bruno and Christina Bruno sought permission to conduct discovery. Lisa Bruno moved to dismiss the motions to open on the ground that both Stephen Bruno and Christina Bruno lacked standing to file them and, therefore, the court was without jurisdiction to consider them. Lisa Bruno also filed motions for protective orders to preclude the requested discovery in support of the postjudgment motions. On November 7, 2011, Judge Axelrod

the court issued it, a motion for reconsideration en banc filed by Stephen Bruno was pending in this court. See Practice Book §§ 71-5 and 71-6. That motion related to the distribution of the Schwab account. "The rules of practice . . . preclude any proceedings to enforce or carry out the judgment while an appellate stay is in effect." *RAL Management, Inc.* v. *Valley View Associates*, 278 Conn. 672, 682, 899 A.2d 586 (2006). We need not decide whether the capias was properly issued.

[9] General Statutes § 52-103 provides in relevant part: "Any court . . . upon motion, may cite in a new party or parties to any action pending before the court . . . and may include in such citation an order for any proper prejudgment remedy or hearing for a prejudgment remedy."

ordered that discovery would proceed, including depositions and subpoenas for documents directed to Lisa Bruno and third parties. The court expressly did not decide the underlying motions to open or Lisa Bruno's motion to dismiss. Two days later, Lisa Bruno appealed from that order.

I

We first address Lisa Bruno's threshold claims that the trial court was without jurisdiction to hear any of the motions to open contempt orders brought by Stephen Bruno or Christina Bruno. With respect to Stephen Bruno, she argues that he does not have standing to file motions, and, therefore, the court has no jurisdiction to decide them for the following four reasons: he has not been aggrieved by the postjudgment effectuation orders; he has unclean hands; he has no legal interest in the subject matter of certain of his motions; and there is no legal relief that the court can grant him. With respect to Christina Bruno's standing, Lisa Bruno argues that because Christina Bruno was not a party to the dissolution action, she has no standing to challenge the orders entered to effectuate the terms of the dissolution judgment and, moreover, that she is "obviously acting as a surrogate for [Stephen Bruno] who refuses to appear in court." Stephen Bruno and Christina Bruno do not address the merits of the standing issues raised by Lisa Bruno, but instead ask this court to decline to decide these issues because they have not been ruled on by the court. Stephen Bruno and Christina Bruno point out that the standing issues raised by Lisa Bruno are at the "top of the trial court's agenda" for resolution when it begins to hear the pending motions to open that are the subject of this appeal. We will address the standing issues here because the relevant underlying facts are matters of record in the court file and our standard of review of jurisdictional matters,

where facts are not in issue, is plenary.[10] See *Doe* v. *Roe*, 246 Conn. 652, 660, 717 A.2d 706 (1998).

"If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 485, 815 A.2d 1188 (2003). "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . [Our Supreme Court] has often stated that the question of subject matter jurisdiction, because it addresses the basic competency of the court, can be raised by any of the parties, or by the court sua sponte, at any time." (Internal quotation marks omitted.) *Fleet National Bank* v. *Nazareth*, 75 Conn. App. 791, 793, 818 A.2d 69 (2003). "Furthermore, there is no question that [a reviewing court] has jurisdiction to consider, on its own initiative, the jurisdiction of the trial court." *Soracco* v. *Williams Scotsman, Inc.*, 292 Conn. 86, 91, 971 A.2d 1 (2009).

## A

### Stephen Bruno—Aggrievement

Lisa Bruno's first argument with respect to Stephen Bruno's claimed lack of aggrievement is that his failures to appear in court and to comply with the financial orders render him lawfully unaggrieved. Specifically, Lisa Bruno asserts that "it is axiomatic that [Stephen Bruno] cannot be aggrieved by orders of the court with which he has wilfully refused to comply and with which he has demonstrated no intention of ever complying."

---

[10] Because we decide the standing issues here, we need not address Lisa Bruno's claim that the court erred by allegedly failing to adhere to the "jurisdiction first" doctrine.

The court, however, has found him to be in contempt on multiple occasions and his refusal to comply with the court's orders has resulted in the issuance of a capias. Stephen Bruno has a "specific, personal and legal interest in the subject matter" of the equitable property distribution and the contempt findings and postjudgment orders have "specially and injuriously affected that specific personal or legal interest." See *Gillon* v. *Bysiewicz*, 105 Conn. App. 654, 659, 939 A.2d 605 (2008).

Lisa Bruno additionally argues that Stephen Bruno cannot be aggrieved because he has not challenged the validity of the original dissolution judgment and related financial orders and, consequently, cannot complain about court orders that merely effectuate that judgment. Additionally, she states: "[Stephen Bruno] never challenged any of those remedial orders on appeal on the basis that they constituted a modification of the original judgment (or for any other reason). Accordingly, it follows a fortiori that the postjudgment remedial effectuation orders, rendered solely for the purpose of restoring and maintaining the integrity of the original judgment, are just as valid as the original judgment and the plaintiff has not been aggrieved."

It does not follow that acquiescence in the original terms of the financial orders in a dissolution action will necessarily lead to agreement as to whether those terms, in the fullness of time, have been complied with. It is possible for a divorced spouse initially not to dispute the financial orders, but nonetheless to dispute whether he is in compliance with those orders. See, e.g., *Eldridge* v. *Eldridge*, 244 Conn. 523, 525–27, 710 A.2d 757 (1998) (husband found in contempt for withholding alimony payments when he believed he was due credit for previous overpayments).[11]

---

[11] For example, in one of the motions to open, Stephen Bruno alleged that Lisa Bruno misled the court into ordering him to pay her $13,998.75 for supposedly failing to transfer to her one half of the 12.23 shares he owned

Moreover, the trial court has the authority, short of modifying the property distribution, to take steps to protect the integrity of the financial orders in the face of changed circumstances. See *Clement* v. *Clement*, 34 Conn. App. 641, 645–46, 643 A.2d 874 (1994) (authority to protect integrity of equitable distribution permitted court to order plaintiff to compensate defendant for value of family residence lost to foreclosure as result of plaintiff's failure to pay mortgage). Stephen Bruno alleged in several postjudgment motions, among other things, that Lisa Bruno had acted in contravention of the terms of the financial orders, by, for example, setting fire to the residence at 38 Pumping Station Road on which she had failed to pay the mortgage. If these allegations are true, the court could find that it was appropriate to reconsider the financial orders with respect to that property so that the totality of the equitable distribution is not undermined. In short, Stephen Bruno's failure to challenge on appeal the terms of Judge Axelrod's financial orders, entered at the time of the dissolution of marriage, did not mean that he could never in the future be aggrieved by postjudgment orders related to the effectuation of the property distribution.

## B

### Stephen Bruno—Unclean Hands

Lisa Bruno next argues that Stephen Bruno's motions cannot be heard in court because he has unclean hands.

in Value Asset Management. In the dissolution judgment, Judge Axelrod had ordered that these shares be divided equally among the parties, but their value was unknown at the time. According to Stephen Bruno, Lisa Bruno had actually received a check for approximately $900 from Value Asset Management, which represented the value of her half of the shares. Stephen Bruno's motion alleged that, despite the fact that this aspect of the order had been carried out, Lisa Bruno deliberately misrepresented a financial affidavit that placed a higher estimated value on the shares to obtain an advantageous order from the court awarding her nearly $14,000. If these allegations are true, Stephen Bruno's failure to object to the terms of the original dissolution judgment would be immaterial.

Specifically, she argues that "more than a century of Connecticut jurisprudence . . . supports [the] fact that the situation at bar *mandates and obliges* the court to refuse and dismiss [Stephen Bruno's] claims." (Emphasis added.) We disagree with this characterization of the clean hands doctrine.

Before addressing this claim, we note that an action to enforce a distribution of marital property is equitable in nature. *German* v. *German*, 122 Conn. 155, 163–64, 188 A. 429 (1936). Despite some antiquated language suggesting the contrary quoted in *Jacobs* v. *Fazzano*, 59 Conn. App. 716, 730, 757 A.2d 1215 (2000), the clean hands doctrine does not implicate standing concerns.[12] See *Dunlop-McCullen* v. *Local 1-S, AFL-CIO-CLC*, 149 F.3d 85, 90 (2d Cir. 1998) ("[t]he unclean hands defense is not an automatic or absolute bar to relief; it is only one of the factors the court must consider when deciding whether to exercise its discretion and grant an injunction" [internal quotation marks omitted]). Instead, "[a]pplication of the doctrine of unclean hands rests within the sound discretion of the trial court." (Internal quotation marks omitted.) *Thompson* v. *Orcutt*, 257 Conn. 301, 308, 777 A.2d 670 (2001). In choosing whether to apply the doctrine, the court should consider whether the party invoking it "has been guilty of misconduct that is more unconscionable than that committed" by the party alleged to have unclean hands. See *Dunlop-McCullen* v. *Local 1-S, AFL-CIO-CLC*, supra, 90, quoting

---

[12] In *Jacobs* v. *Fazzano*, supra, 59 Conn. App. 730, the court cited 1 J. Story & W. Lyon, Commentaries on Equity Jurisprudence (14th Ed. 1918) p. 98, for the proposition that, "before a complainant can have *a standing* in court he must first show that not only has he a good and meritorious cause of action, but he must come into the court with clean hands." (Emphasis added; internal quotation marks omitted.) This language is clearly dictum. In *Jacobs* itself, this court, implying that the plaintiff lacked clean hands, remanded the case with direction to render judgment *denying* the petition at issue, not *dismissing* the action. *Jacobs* v. *Fazzano*, supra, 732. A party's lack of clean hands can defeat an equitable action on the merits, but does not prevent a party from invoking the jurisdiction of the court.

11A C. Wright et al., Federal Practice and Procedure: Civil (2d Ed. 1995) § 2946, p. 112. As the foregoing makes clear, the trial court has discretion in the use of the clean hands doctrine.

C

Stephen Bruno—No Interest in 111 Spring Valley Road

Lisa Bruno also claims that Stephen Bruno does not have standing to file motions with respect to the marital property at 111 Spring Valley Road because, pursuant to the court's order of August 6, 2010, the title to that property supposedly was transferred to her outright. This characterization of the effect of that order reflects, at best, a misunderstanding of the basis for its issuance.

Judge Winslow's order provided, in relevant part: "[A]t this time, I'm going to transfer, via [General Statutes § 46b-81], the title to the property at 111 Spring Valley Road in Ridgefield solely to the defendant, Lisa Bruno, *for the purpose of effectuating the orders of the court, meaning, of course, Judge Axelrod's orders, to bring about a sale of the property.* With the sole title to the property, [Lisa] Bruno will have the authority to sign any documents necessary to market and sell the property, transfer ownership, et cetera." (Emphasis added.) The order from Judge Axelrod to which Judge Winslow's order referred stated: "The property at 111 Spring Valley Road shall continue to be listed for sale under the current listing agreement or any extension of renewal thereof. *The parties are to retain equally the net proceeds of the sale.*" (Emphasis added.) If there was any ambiguity that the purpose of the order assigning title to 111 Spring Valley Road to Lisa Bruno was to effectuate a sale of that property, the court expressly stated that it was possible that Stephen Bruno may have an interest in part of the sale proceeds. The court did not assign the property to Lisa Bruno outright;

indeed, the court could not have done so without impermissibly modifying the division of marital property. See General Statutes § 46b-86 (a). Accordingly, Stephen Bruno has retained a property interest in 111 Spring Valley Road and has standing to file motions with respect to the distribution of funds generated from a sale of the property.

## D

### Stephen Bruno—No Practical Relief Can Be Afforded by the Court

Lisa Bruno's final contention with respect to Stephen Bruno's purported want of standing is nearly indistinguishable from her claim that he is not aggrieved by the court's postjudgment orders. She argues that because the court cannot modify the equitable property distribution, granting Stephen Bruno's motions to open would not afford him any practical relief. As noted previously, the court in postdissolution proceedings does not have the authority under § 46b-86 (a) to modify property distribution orders, but "it is within the equitable powers of the trial court to fashion whatever orders [are] required to protect the integrity of [its original] judgment." (Internal quotation marks omitted.) *Roberts* v. *Roberts*, 32 Conn. App. 465, 471, 629 A.2d 1160 (1993). Lisa Bruno characterizes Stephen Bruno's postjudgment motions as attempts to modify the equitable distribution; in reality, several of the motions seek to open contempt orders that Stephen Bruno alleges were obtained by Lisa Bruno's misrepresentations to the court. Moreover, a dissolution judgment can be opened on the basis of fraud beyond the four month period normally allowed for opening a judgment. See *Mattson* v. *Mattson*, 74 Conn. App. 242, 243 n.1, 811 A.2d 256 (2002) ("[a]lthough the motion to open the judgment was filed more than four months from the date of dissolution . . . the court has inherent power to determine if fraud exists" [citation omitted]).

In sum, Lisa Bruno's four grounds for arguing that Stephen Bruno does not have standing to file motions to open are without merit; accordingly, the trial court has jurisdiction to hear them, subject to the limitations explained in the second part of this opinion.

E

Christina Bruno—Standing

Lisa Bruno additionally claims that Christina Bruno does not have standing to open any of the postjudgment orders directed at her husband, Stephen Bruno. We agree. Christina Bruno was cited in by the court because Lisa Bruno alleged that she was the recipient of fraudulent transfers of money from the Schwab account. Christina Bruno's motions to open challenged orders finding Stephen Bruno in contempt and sought orders that he be granted certain funds. Christina Bruno has no "specific, personal and legal interest in the subject matter" of these decisions. See *Gillon* v. *Bysiewicz,* supra, 105 Conn. App. 659–60. For example, she filed a motion to vacate the capias issued by the court, but the capias, of course, was issued against Stephen Bruno and she has not been legally aggrieved by that order. Indeed, Stephen Bruno filed his own motion requesting the same relief. Christina Bruno, as Lisa Bruno points out, cannot act as a surrogate to challenge adverse orders issued against Stephen Bruno. Christina Bruno argues that she could be "prejudiced and impacted by [Lisa Bruno's] attempted enforcement of any improper [and] unauthorized orders and claims against her and [Stephen Bruno] . . . ." But she cannot achieve standing by virtue of the fact that her husband may be financially and legally affected by the court's orders.[13]

[13] Lisa Bruno additionally claims that Stephen Bruno's and Christina Bruno's alleged failure to pay filing fees required by General Statutes § 52-259c (b) rendered the trial court without authorization to consider their motions. In the court's articulation, it stated that filing fees were not required because Stephen Bruno's and Christina Bruno's motions to open related to postjudgment orders instead of judgments. Even if the court's distinction

## II

Having determined that only Stephen Bruno has standing to pursue his motions before the trial court, we next address Lisa Bruno's claims that the court erred by permitting discovery related to his various motions to open. Specifically, Lisa Bruno argues that the court did not have the authority to permit discovery without first making a preliminary finding. We agree.

"Courts have an inherent power to open, correct and modify judgments. . . . A civil judgment of the Superior Court may be opened if a motion to open or set aside is filed within four months of the issuance of judgment." (Internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 106, 952 A.2d 1 (2008). As a general matter, a civil judgment "may not be opened or set aside unless a motion to open or set aside is filed within four months succeeding the date on which notice was sent." Practice Book § 17-4; see also General Statutes § 52-212a. "The requirement that motions to [open] to correct 'judicial' error be made within a limited period of time arises from the common law rule concerning jurisdiction over the parties. '[I]n the interest of the public as well as that of the parties there must be fixed a time after the expiration of which the controversy is to be regarded as settled and the parties freed of obligation to act further in the matter by virtue of having been summoned into or having appeared in the case.' [*Foley* v. *George A. Douglas & Bro., Inc.*, 121 Conn. 377, 380, 185 A. 70 (1936)]. Without such a rule, no judgment could be relied on. 'Such uncertainty and instability in legal relations which have apparently been finally adjudicated does not commend itself as orderly judicial procedure.' [*Cichy* v. *Kostyk*,

was misplaced, however, a mistake by the court with respect to the necessity of a filing fee does not deprive the court of subject matter jurisdiction to hear a motion to open. See *Kores* v. *Calo*, 126 Conn. App. 609, 620–21, 15 A.3d 152 (2011).

143 Conn. 688, 695, 125 A.2d 483 (1956)]." (Footnotes omitted.) 2 R. Bollier & S. Busby, Stephenson's Connecticut Civil Procedure (3d Ed. 2002) § 199, pp. 427–28.

Section 52-212a does not abrogate the court's common-law authority to open a judgment beyond the four month limitation upon a showing that the judgment was obtained by fraud, duress or mutual mistake. See *Nelson* v. *Charlesworth*, 82 Conn. App. 710, 713, 846 A.2d 923 (2004). "The common-law reasons for opening a judgment seek to preserve fairness and equity." Id., 713–14.[14]

Until a motion to open has been granted, the earlier judgment is unaffected, which means that there is no active civil matter. See *Oneglia* v. *Oneglia*, supra, 14 Conn. App. 269. In this postjudgment posture, discovery

---

[14] There are two ways of viewing the challenged court action at issue here: either the court implicitly granted the motions to open, thereby allowing discovery to go forward, or it allowed discovery to proceed simply on the basis of the filing of the motions to open. Either interpretation implicates final judgment concerns. See *Nelson* v. *Charlesworth*, supra, 82 Conn. App. 712 ("[o]rdinarily, the granting of a motion to open a prior judgment is not a final judgment, and, therefore, not immediately appealable" [internal quotation marks omitted]); see also *Melia* v. *Hartford Fire Ins. Co.*, 202 Conn. 252, 255, 520 A.2d 605 (1987) ("[a]n order issued upon a motion for discovery is ordinarily not appealable because it does not constitute a final judgment" [internal quotation marks omitted]). Lisa Bruno's claims are immediately appealable, however, because they question the authority of the trial court to grant a motion to open without a preliminary finding of fraud and to permit postjudgment discovery on the mere filing of a motion to open. A challenge to the trial court's authority to grant a motion to open is a recognized exception to the general final judgment rules with respect to such motions. See, e.g., *Nelson* v. *Charlesworth*, supra, 712 (where "colorable claim is made that the trial court lacked the power to open a judgment," granting of motion to open is immediately appealable [internal quotation marks omitted]); *Richards* v. *Richards*, 78 Conn. App. 734, 738, 829 A.2d 60 (court's failure to make threshold finding of mutual mistake before granting motion to open immediately appealable as challenge to court's authority to open judgment), cert. denied, 266 Conn. 922, 835 A.2d 473 (2003). In the present case, there was no preliminary determination on the issue of fraud; accordingly, there was no basis for the court to grant the motions to open. As explained in part II of this opinion, if a court does not grant a motion to open, discovery is impermissible.

is not available to the moving party for the simple reason that discovery is permitted only when a cause of action is pending. See id., 270 n.2 ("For us to say that [the discovery] provisions [of General Statutes § 52-197 [a] and Practice Book § 13-2] apply only when there is a cause of action currently pending is to state the obvious. Until and unless the trial court opened the previous judgment, there would no 'civil action' within the meaning of General Statutes § 52-197 or Practice Book § [13-2].''). In short, there is no such thing "as postjudgment discovery" in a vacuum. See id., 269.[15]

In considering a motion to open the judgment on the basis of fraud, then, the trial court must first determine whether there is probable cause to open the judgment for the limited purpose of proceeding with discovery related to the fraud claim. See *Spilke* v. *Spilke*, 116 Conn. App. 590, 593–94, 976 A.2d 69, cert. denied, 294 Conn. 918, 984 A.2d 68 (2009). This preliminary hearing "is not intended to be a full scale trial on the merits of the [moving party's] claim. The [moving party] does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim." (Internal quotation marks omitted.) *Malave* v. *Ortiz*, 114 Conn. App. 414, 426, 970 A.2d 743 (2009). If the moving party demonstrates to the court that there is probable cause to believe that the judgment was obtained by fraud, the court may permit discovery. See *Oneglia* v. *Oneglia*, supra, 14 Conn. App. 269–70 (approving trial court's position that "[i]f the plaintiff was able to substantiate her allegations of fraud beyond mere suspicion, then the court would open the judgment for the limited purpose of discovery, and would later issue an ultimate decision on the motion to open

---

[15] The bar on postjudgment discovery applies regardless of whether the motion to open is filed within four months of the judgment. See *Oneglia* v. *Oneglia*, supra, 14 Conn. App. 268.

after discovery had been completed and another hearing held").

Stephen Bruno replies that the trial court has the authority to permit discovery pursuant to *Conboy* v. *State*, 292 Conn. 642, 974 A.2d 669 (2009), because the resolution of certain factual issues is necessary before the court can determine whether it has jurisdiction to decide the motions to open. *Conboy*, however, is inapposite. In that case, the issue raised by the state's motion to dismiss was whether sovereign immunity barred the plaintiffs' suit against the state. Id., 648–49. The state and the plaintiffs disputed a critical factual issue: whether the layoff of 2800 state workers was the result of economic conditions or the workers' union status. Id., 648. If the former was the reason for the layoffs, sovereign immunity would deprive the court of subject matter jurisdiction; if the latter, the suit could go forward. Id., 649. Our Supreme Court held that the trial court correctly denied the state's motion to dismiss because the jurisdictional issue required further factual findings. This holding is of no relevance here. *Conboy* dealt with a live controversy, rather than one in which judgment had been rendered. In support of its motion to dismiss on the ground of sovereign immunity—or lack of subject matter jurisdiction—the state requested that the court take judicial notice of facts allegedly established by certain publicly available documents. Id., 647. The trial court denied the motion to dismiss, holding that there were factual issues that could not be decided on a motion to dismiss. Id., 648. The issue in the present case was simply not raised in *Conboy*. The discovery sought here was in the context of a post-judgment motion to open; by definition, there already has been a final judgment. *Oneglia* is, therefore, controlling.

The court in the present case did not determine whether there was probable cause to believe Stephen

Bruno's allegations of fraud by Lisa Bruno. Without such a hearing and a corresponding determination by the court that the allegations of fraud undergirding the motions to open had some minimal indicia of merit, the court lacked the authority to allow discovery. "[A] party seeking to open a judgment . . . on the basis of allegations of fraud has [no] right to conduct discovery based only on its filing of a motion to open." *Mattson v. Mattson*, supra, 74 Conn. App. 247.[16]

The court's orders denying Lisa Bruno's motions for protective orders and motions to quash subpoenas are reversed and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.

---

[16] The trial court, in its articulation, stated that the rule in *Oneglia* v. *Oneglia*, supra, 14 Conn. App. 267, precludes discovery only pursuant to a motion to open a dissolution judgment, and would not apply here because Stephen Bruno is seeking to open certain postjudgment orders. The court in *Oneglia*, however, did not hold that postjudgment discovery is barred only as to motions to open dissolution judgments; it based its decision on the broader proposition that, in the absence of a live dispute, our discovery statutes and the rules of practice do not allow for discovery. We see no reason for distinguishing the postjudgment orders constituting final judgments from any other final judgment. Moreover, Stephen Bruno cites as authority for opening the postjudgment orders General Statutes § 52-212 (a) and Practice Book § 17-4 and argues that "it is a well established rule that . . . *a judgment* rendered by the court . . . can subsequently be opened [after the four month] limitation . . . if it is shown that *the judgment* was obtained by fraud . . . ." (Emphasis added; internal quotation marks omitted.) Therefore, Stephen Bruno has not argued to the trial court that the postjudgment

---

orders should be treated any differently from judgments when the affected party seeks to open them.